**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| THERESA SANDRA CONSTANT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-0594 |
| | § | |
| CITY OF BAYTOWN, TEXAS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This suit against the City of Baytown and individuals alleged to be policymakers for the City and its police department arises out of the use of a taser.[1]  Plaintiff, Teresa Sandra Constant, alleges that the use of a taser by police officers on January 25, 2002 constituted excessive force that violated her Fourth Amendment rights.  Constant asserts municipal and supervisory liability under 42 U.S.C. § 1983 and state-law causes of action for assault, battery, and violations of the Texas Tort Claims Act.  The defendants have moved for summary judgment as to all claims.  (Docket Entry Nos. 33, 34).  Constant has filed a response.  (Docket Entry No. 35).  Based on a careful review of the pleadings, the motion and response, the parties' submissions, and the applicable law, this court grants the motion for summary judgment and, by separate order, enters final judgment.  The reasons are set out

---

[1]A taser is an electric high-voltage, low-frequency stun gun, intended for police use as a nonlethal immobilizing weapon that temporarily paralyzes a subject.  The name is an acronym from *Tom Swift's Electric Rifle*, a 1911 science fiction book about a teenage inventor.  17 OXFORD ENGLISH DICTIONARY 655 (2d ed. 1989).

below.

## II.    Background

### A.    Procedural History

Constant sued the City of Baytown and a number of individual defendants on December 2, 2003.  (Docket Entry No. 1).  She alleged that on  December 2 or 3, 2001, she was tasered without justification by Baytown police officers during the course of an arrest. Constant named two police officers, Bert Dillow and Micah Aldred, as among those who used the taser.  She named one other police officer, David Alford, as a defendant, but did not allege that he used a taser or provide specifics about his involvement.  Constant also named as defendants the City of Baytown; the mayor, Pete Alfaro; the city manager, Gary Jackson; the chief of police, Byron Jones; and city council members Scott Sheley, Mercedes Renteria, Calvin Mundinger, Don Murray, Ronnie Anderson, and Coleman Godwin.

In June 2004, Constant sought leave from this court to amend her complaint to allege that the tasering had not occurred in December 2001, but on January 25, 2002.  She also sought to add the police officers involved in the January 2002 incident as defendants. (Docket Entry No. 12).  The causes of action were the same as those asserted in the original complaint:  excessive force and unlawful search under 42 U.S.C. § 1983 as to the individual officers, supervisory and municipal liability based on an unconstitutional custom or practice against the City and the individual policymakers, and related state-law claims.  The officers allegedly involved in the January 2002 incident, Christopher Felder, Mark Wilburn, Shawn Fischer, and Michael Holden, had not been named or identified in the original complaint.

(Docket Entry Nos. 12, 13).

In March 2005, this court granted Constant leave to amend the complaint to add the January 2002 incident to the case, but denied her leave to name new party defendants because limitations had run and relation back did not apply. This court also granted defendants' motions for summary judgment as to the allegations arising from the December 2001 incident and the state-law claims arising from the January 2002 incident. (Docket No. 26). Constant also filed a notice of nonsuit as to Officers Dillow and Aldred, which was granted. (Docket Nos. 20, 23). The remaining defendants are the City of Baytown, Lieutenant David Alford, Police Chief Byron Jones, Mayor Pete Alfaro, City Manager Gary Jackson, and City Council members Mercedes Renteria, Scott Sheley, Don Murray, Calvin Mundinger, Ronnie Anderson, and Coleman Godwin. The remaining claims are that the City and the individual policymakers are liable under section 1983 for the January 2002 use of a taser by City police officers.

**B.      The Summary Judgment Evidence**

The summary judgment evidence consists of excerpts from Constant's deposition;[2] depositions of Police Chief Jones,[3] police officers Felder and Fisher, and Sergeant Holden;[4] affidavits by Mayor Alfaro, Officers Alford and Wilburn,[5] Police Chief Jones, City Manager

---

[2]Docket Entry No. 34, Ex. A; Docket Entry No. 35, Ex. B.

[3]Docket Entry No. 35, Ex. I.

[4]Docket Entry No. 34, Exs. B, C, D; Docket Entry No. 35, Exs. C, D, E.

[5]Docket Entry No. 34, Ex. P.

3

Jackson, and City Council members Anderson, Godwin, Mundinger, Murray, Renteria, Sheley; an affidavit from the City record custodian;[6] Constant's medical records;[7] personnel records for Officers Felder, Fischer, Wilburn, and Sergeant Holden;[8] a preliminary expert report by Alan Baxter on Constant's behalf;[9] the City of Baytown's Advanced Taser Deployment Procedure and Use of Force General Order;[10] and the January 2002 Baytown Police Department incident report.[11]

### C.    Factual Background

In January 2002, Constant was 37 years old and was approximately 5'5" or 5'6" tall. (Docket Entry No. 7, Ex. E; Docket Entry No. 35, Ex. E at 9).  Constant testified that in early January 2002, she had injured her leg and was in an "immobilizer" cast that required her to use crutches to walk.  (Docket Entry No. 34, Ex. A).  However, the police testified that they did not see any cast or crutches and did not see any evidence that her leg was injured. The medical records do not show that in January 2002, Constant had an injured leg.  (Docket Entry No. 34, Ex. C at 34-36; Docket Entry No. 34, Ex. Q).

Constant testified that she may have snorted some cocaine around lunchtime on

---

[6]Docket Entry No. 34, Exs. E, F, G, H, I, J, K, L, M, N, O.

[7]Docket Entry No. 34, Ex. Q.

[8]Docket Entry No. 34, Exs. R, S, T, U.

[9] Docket Entry No. 35, Ex. F.

[10]Docket Entry No. 35, Ex. G, H.

[11]Docket Entry No. 35, Ex. J.

4

January 24, 2002.  (Docket Entry No. 34, Ex. A at 34).  That night, she went to a local bar and had three beers.  (*Id.* at 33).  She then went to the trailer of a person named Richard, whose last name she did not know, where she also had "a few beers."  (*Id.* at 33, 37).  She testified that she did not feel intoxicated.  (*Id.* at 33).  Constant testified that she became afraid when Richard refused to let her leave the trailer.  She used her cell phone to telephone the police around 1:00 or 1:30 a.m. on January 25, 2002 and asked for help.  (*Id.* at 35, 38).  After Constant called the police, Richard left the trailer, leaving her alone.  (*Id.* at 38).  Constant stayed inside the trailer and was there when police arrived.

Constant testified that when the police arrived, they asked if she had been drinking.  (*Id.* at 47).  Constant told the police officers that she had a few beers.  (*Id.*).  The police asked her to leave the trailer.  Constant refused.  She testified that she did not understand the reason for their request.  (*Id.*).  When she refused, according to Constant, two police officers grabbed her arms and pulled her from the trailer, leaving her crutches behind.  Constant alleges that when she asked for her crutches, the police began tasering her.  (*Id.*).  Constant testified that she was on the ground, trying to scoot away from the police, who continued to apply the taser while yelling at her to stand up and to shut up.  (*Id.* at 50-51).  Constant testified that she was in excruciating pain and thought the police were going to kill her.  (*Id.* at 51-52).  As a result of her fear and pain, she does not remember much of what happened that night.  (*Id.* at 54-57).  Constant testified that she received 22 burn marks from the tasering, on her groin, breasts, neck, back, buttocks, and legs.  (*Id.* at 51).  She claims that the tasering left permanent scars on her groin, breast, and stomach.  (Docket Entry No. 35,

Ex. B at 76).

The officers provided detailed testimony as to the circumstances of the taser use. Officers Fischer and Felder were the first to respond to a call that a woman was screaming for help. (Docket Entry No. 34, Ex. B at 1; Docket Entry No. 34, Ex. C at 29). The officers entered the trailer and found Constant alone, screaming that people were coming into the trailer through the floors. No one else was in the trailer. The officers left the trailer to call EMS. (Docket Entry No. 34, Ex. B at 99-100). Constant followed them out of the trailer, moving erratically around the yard and muttering to herself. (Docket Entry No. 34, Ex. C at 34-35). Constant chased Officer Fischer out of the yard to his patrol car, where he called for a taser unit and EMS. (*Id.* at 36-37). Constant ripped the plastic bug guard off a nearby car's windshield and chased Officer Felder around his patrol car with it, threatening to hit him. (Docket Entry No. 34, Ex. B at 65; Docket Entry No. 34, Ex. C at 39). Officer Wilburn arrived, warned Constant to put the bug guard down, and told her to sit down. (Docket Entry No. 35, Ex. J at 7). Constant approached him aggressively, waving her arms wildly. Officer Wilburn used his taser from a distance of ten feet. (*Id.*; Docket Entry No. 34, Ex. C at 42-43). The tasering seemed to have no effect on Constant. (*Id.*). Wilburn applied two more five-second cycles, again from a distance. Constant began to crawl under a vehicle. (Docket Entry No. 35, Ex. J at 7). The officers tried to restrain her manually so that she could be taken to a hospital, but she continued to struggle and thrash about. Wilburn used the taser once more, this time applying direct contact. (*Id.*; Docket Entry No. 34, Ex. B at 35-36).

When Sergeant Holden arrived, he found Officer Wilburn behind Constant, attempting

to apply handcuffs.  Constant was struggling and Wilburn could not hold Constant's arms still long enough to apply the handcuffs.  Wilburn put his taser in its holster to try to handcuff Constant. Holden used his taser to try to immobilize Constant so that Wilburn could apply the handcuffs.  (Docket Entry No. 34, Ex. C at 50-51).  Despite the taser's application, Constant continued to kick the officers.  Sergeant Holden used the taser again to try to enable the officers to restrain her feet.  (*Id.* at 43; Docket Entry No. 34, Ex. D at 52-53).  Sergeant Holden applied five contact taserings within a minute.  (Docket Entry No. 34, Ex. D at 92). The emergency medical personnel called by the police who initially responded to the call took Constant to the hospital as soon as she was sufficiently subdued.  Constant was screaming and cursing through the entire interaction with the officers; she yelled that people were after her, that she had a yeast infection, and that the officers were not really the police. (Docket Entry No. 34, Ex. B at 39-40; Ex. D at 43-44; Docket Entry No. 35, Ex. J at 6, 7).

Officer Wilburn escorted Constant to the hospital.  (Docket Entry No. 34, Ex. P at 3–4).  Constant does not remember the medical treatment she received, but the records from San Jacinto Methodist Hospital show that she was diagnosed as needing treatment for psychosis.  (Docket Entry No. 34, Ex. A at 78–81; Docket Entry No. 34, Ex. Q at 124).  The medical records show that on arrival, Constant refused to give her name, was foaming at the mouth, was screaming – "Please don't shoot me.  Don't hurt me" – and had to be restrained by hospital staff.  (Docket Entry No. 34, Ex. Q at 127).  She was admitted to the hospital at 2:11 a.m. on January 25 and transferred at 4:30 p.m. that day to the San Jacinto Mental Health Ward. (*Id.* at 123, 147; Docket Entry No. 35, Ex. J at 4).  Her final diagnosis was

7

poisoning and toxic effects of drugs, unspecified psychosis, poisoning by central nervous system stimulant, drug-induced delirium, cocaine abuse, acute alcoholic intoxication, alcoholism, self-inflicted poisoning by drug/medicinal substance, adjustment disturbance of emotions and conduct, and cardiac dysrhythmia. (Docket Entry No. 34, Ex. Q at 146). According to Alan Baxter, who testified for Constant as an expert in police procedure, her medical condition and intoxication diminishes the reliability of her testimony about what happened on January 25.  (Docket Entry No. 35, Ex. F at 10).

The summary judgment record also includes evidence as to the Baytown Police Department Advanced Taser Deployment Procedure, effective October 17, 2001, and the training officers receive in taser use.  The Procedure states that tasers are equivalent in force to pepper spray.  Each taser must be tested and every test must be recorded in a log. (Docket Entry No. 34, Ex. C).  Officers must be trained to use tasers.  The taser course includes five hours covering the taser itself, safety, effectiveness, and appropriateness.  (Docket Entry No. 34, Ex. P at 2).  The training course covers the Police Department's written taser Procedure and the City's Use of Force General Order.  (*Id.* at 2–3).  The taser training course is followed by a "live-fire" scenario and a written exam.  (*Id.*).  Finally, each officer is tasered himself.  (*Id.* at 2; Docket Entry 34, Ex. C at 14-16).  The taser Procedure requires officers to announce their intent to use a taser before it is applied.  An officer using a taser must ensure that the subject receives prompt medical treatment.  Each use of a taser must be documented by a Use of Force Detail Page.  (Docket Entry No. 34, Ex. G).  Both Officer Wilburn and Sergeant Holden were trained and certified in taser operation. (Docket Entry

8

No. 34, Ex. C at 38, Ex. D at 25-26; Docket Entry No. 35, Ex. J at 6).

The defendants have moved for summary judgment as to all Constant's claims. Each of the claims and the summary judgment arguments is analyzed below.

## III.    The Applicable Legal Standards

### A.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56. Rule 56(c). The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln General Ins. Co. v. Reyna*, 401 F.3d (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 535 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). If the moving party fails to

meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Young v. Exxonmobil Corp.*, 155 Fed. Appx. 798, 800 (5th Cir. 2005).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Young*, 155 Fed. Appx at 800. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006) (quoting *Celotex*, 477 U.S. at 322).

### B.      Municipality and Supervisory Liability for Excessive Force

"To prevail on an excessive force claim, a plaintiff must show: (1) injury, (2) which

resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005) (citing *Harper v. Harris County*, 21 F.3d 597, 600 (5th Cir. 1994)). Because the individual officers who applied the taser to Constant in January 2002 are not parties to this case, Constant relies on theories of municipal and supervisory liability for the excessive force she alleges. "Municipalities face [section] 1983 liability 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury. . . .'" *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978). "Proof of municipal liability sufficient to satisfy *Monell* requires:  (1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002).  The "policy or custom" requirement of a section 1983 claim can be satisfied with proof of:  "(1) a policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official delegated policy making authority; or (2) a persistent, widespread practice of city officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984).  A description of the policy or custom and its relationship to the underlying constitutional violation cannot be conclusory and must contain specific facts. *Spiller v. City of Tex. City*, 130 F.3d 162, 167

11

(5th Cir.1997).

A single act by a final policymaker may constitute an official policy only if that act was made with "deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Brown v. Bryan County*, 219 F.3d 450, 460-61 (5th Cir. 2000).   There must be a "high degree of predictability concerning the consequences of the challenged decision." *Id*. at 460.  Negligence is not enough. *Id*. at 457.

A plaintiff may rely on a claim that the municipality is liable for failing to provide adequate training or supervision to police officers.  Constant alleges that the City of Baytown is liable for the failure to train or supervise its police officers in the proper use of tasers. Liability for the failure to train or supervise police officers only arises if the municipality was deliberately indifferent to the rights of persons with whom the officers come into contact. *Connor v. Travis County*, 209 F.3d 794, 796 (5th Cir. 2000); *Pineda v. City of Houston,* 291 F.3d 325, 332 (5th Cir. 2002).  A plaintiff may show that the city deliberately chose not to provide adequate training and supervision in the proper use of force in specific situations, despite knowing of improper and excessive use of force in those situations. *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 407-08 (1997).  The plaintiff may also rely on a single incident, but only if officers have been placed in "recurring situations that present an obvious potential for violation of constitutional rights and the need for additional or different police training [or supervision]." *See Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 288 (5th Cir. 2002).  "The single incident exception . . . is a narrow

one, and one that [the Fifth Circuit has] been reluctant to expand." *Burge v. St. Tammany Parish*, 336 F.3d 363, 373 (5th Cir. 2003) (citing *Pineda*, 291 F.3d at 334–35).   Liability cannot be imposed on a municipality under section 1983 unless deliberate action attributable to the municipality itself is the moving force behind the violation.  *Board of County Com'rs v. Brown*, 520 U.S. at 404.

### C.      Claims against the Defendants in their Individual Capacities

A supervisory officer cannot be held liable under section 1983 on the basis of *respondeat superior.  Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997).  "Rather, the misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor."  *Id.* (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir. 1994) (en banc)).  "Supervisory officials may be held liable only if: (i) they affirmatively participate in acts that cause constitutional deprivation; or (ii) implement unconstitutional policies that causally result in plaintiff's injury." *Baker v. Putnal*, 75 F.3d 190, 199 (5th Cir. 1996) (citing *Mouille v. City of Live Oak, Tex.*, 977 F.2d 924, 929 (5th Cir. 1992)).  "For a police chief to be held liable under section 1983, there must be some connection between the chief's action and the alleged constitutional violation." *Id*.

In this case, there is no allegation that the police chief was personally involved in the alleged constitutional violation.  Constant relies on a failure-to-train theory of liability.  A plaintiff relying on supervisory liability to sue a police officer in his individual capacity must show that:

> (1) the police chief failed to supervise or train the officer; (2) a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights; and (3) the failure to supervise or train amounted to deliberate indifference to the plaintiff's constitutional rights. . . . Moreover, to prove deliberate indifference, a plaintiff must demonstrate at least a pattern of similar violations arising from the training that is so clearly inadequate as to be obviously likely to result in a constitutional violation.

*See Roberts v. Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005).

The City officials and council members sued in their individual capacities were as policymakers were also not directly involved in the events Constant alleges. To find to them liable, Constant must make the same showings of "deliberate indifference" and causation required for municipal liability. *Id.* at 292.

### D.    Qualified Immunity

The individual defendants, including the police chief, mayor, and the city council members, have pleaded qualified immunity. "Qualified immunity shields an official performing discretionary functions from civil damages liability, provided his actions meet the test of objective legal reasonableness." *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999). Qualified immunity analysis is a two-part inquiry. "The first step is to determine whether plaintiff alleged a violation of a clearly established constitutional right." *Bazan*, 246 F.3d at 490; *Price v. Roark*, 256 F.3d 364, 369 (5th Cir. 2001); *Glenn*, 242 F.3d at 312-12. "The second step requires determining whether . . . the [defendant's] conduct was objectively reasonable under clearly established law at the time of the incident." *Bazan*, 246 F.3d at 490

14

(emphasis removed from original); *Glenn*, 242 F.3d at 312-13. "The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001)(citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). "Objective reasonableness is a matter of law for the courts to decide, not a matter for the jury." *Williams*, 180 F.3d at 703 (citing *Mangieri v. Clifton*, 29 F.3d 1012, 1015-16 (5th Cir. 1994)); *see also Hare v. City of Corinth*, 135 F.3d 320, 325 (5th Cir. 1998). "However, underlying historical facts may be in dispute that are material to the reasonableness determination." *Williams*, 180 F.3d at 1016 (citing *Mangieri*, 29 F.3d at 1016). Such a factual dispute may preclude summary judgment on the issue of qualified immunity. *Wooley v. City of Baton Rouge*, 211 F.3d 913, 919 (5th Cir. 2000); *see also Mangieri*, 29 F.3d at 1016; *Harper v. Harris County, Texas*, 21 F.3d 597, 601 (5th Cir. 1994).

## IV.     Analysis

### A.     The Municipal and Supervisory Liability Claims

Constant offers two theories under which the City of Baytown might be liable. The first basis is that the City of Baytown Police Department had policies or customs that directly caused her injury. Constant identifies the following policies and customs that she asserts caused her injury: covering up police misconduct, nepotism and negligent hiring and retention, unqualified supervision, and overly broad taser guidelines. The second basis is that the Police Department had a policy or custom of failing to provide adequate training to its officers in taser use.

A custom or policy must be "the moving force of the constitutional violation." *Monell*, 426 U.S. at 694.  A plaintiff alleging a custom that caused a constitutional violation must show a "persistent and widespread practice." *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002).

The record in this case shows no basis to support Constant's claim of a policy or custom of covering up police misconduct, that caused the constitutional violation Constant alleges.  The summary judgment evidence shows no evidence of repeated coverups of taser use or other use-of-force incidents.  The evidence also shows no effort to hide the taser use in the present case.  After Constant was subdued and taken to the hospital on January 25, 2002, the police officers involved in the taser use wrote a report as required by Police Department procedures.  The officers filed the taser cartridge as evidence. (Docket Entry No. 35, Ex. J).  Constant has shown no evidence that the police covered up this or other excessive force incidents or that any such cover up could have been the moving force behind her constitutional injury.

The record similarly fails to support Constant's claims of hiring and retention policies or customs in the Police Department that led to the constitutional violation she alleges. There is no evidence in the record that there was a policy or practice of hiring or retaining police officers based on nepotism or that the police officers involved in the January 25 incident were hired because of nepotism.

The summary judgment evidence does show that Officer Aldred, who was not involved in the tasering incident, had an unsavory history. (Docket Entry No. 35, Ex. I, 3-32,

16

60-51, 103-110) (arrest for fraud, arrest for assault, complaints of improper kicking out a taillight and excessive force). Constant has not shown evidence of a policy or persistent and widespread practice of hiring or retaining officers who had a history of violence. Nor has Constant raised a fact issue as to whether any such policy or custom could have caused her injury. As noted, Officer Aldred was not involved in the January 25, 2002 incident. The four officers who were involved have collectively one excessive force reprimand among them over a combined total of fifty-three years as police officers. *See Aguillard v. McGowen*, 207 F.3d 226 (5th Cir. 2000) (finding no deliberate indifference to the danger of excessive force when the officer had exhibited a clear pattern of prior use of violence and force). Constant has shown no evidence to support her allegations of persistent and widespread hiring and retention of officers who had a history of violence, or that such a policy or custom could have been the moving force of the alleged constitutional deprivation.

Constant claims that the Baytown Police Department had an "ongoing practice and custom of using unqualified supervisors." (Docket Entry 35 at 11). She bases this allegation on the claim that Sergeant Holden, who is not a party, was not qualified to be a supervisor and provided inadequate supervision to the officers who were involved in the January 2002 incident. (Docket Entry 35 at 10; Ex. F at 32). Constant relies on evidence that the Baytown Police Department used acting sergeants instead of promoted sergeants to meet its manpower needs. (*Id at* 75-76.). Constant has, however, failed to raise a fact issue as to whether this policy or practice caused the constitutional violation she alleges. Although Holden was an acting sergeant and not a fully promoted sergeant in January 2002, he was promoted in

17

February 2002.  The record shows that Sergeant Holden had ten years of experience as a police officer.  (Docket Entry No. 35, Ex. D at 34; Docket Entry No. 34, Ex. D at 4–5).  There is no evidence in the record to support the allegation that he was an unqualified supervisor.   Based on the record, Constant has failed to raise a fact issue as to whether the Baytown Police Department had a policy or practice of providing inadequate supervision to its police officers in January 2002.

Constant claims that the Baytown Police Department's Procedure for taser use "caused unconstitutional conduct because it is overly broad and vague." (Docket Entry No. 35 at 14).  Constant alleges that too much is missing from the Procedure for it to be effective, such as examples or different types of tasers.  (Docket Entry No. 35 at 14-15).  Alan Baxter, presented by Constant as an expert in police procedure, claims that the taser Procedure was deficient. (Docket Entry No. 35, Ex. F at 15).

A taser policy that has significant flaw and gaps may raise a fact issue as to municipal liability for taser use. *McKenzie v. City of Milpitas*, 738 F. Supp. 1293, 1301 (N.D. Cal. 1990).  The Baytown Advanced Taser Deployment Procedure, effective October 17, 2001, is specific and detailed in ways that the procedure at issue in McKenzie was not.  The Procedure for taser training and use recognizes the nature of the  taser, equating it to pepper spray in force.  (Docket Entry No. 34, Ex. D at 26-27; Ex. G at 1).  The Procedure restricts taser use to:

> control a dangerous or violent subject when deadly physical force does not appear to be justified and/or necessary; or attempts to subdue the subject by other conventional tactics have been, or will likely be,

18

> ineffective in the situation at hand; or there is reasonable expectation
> that it will be unsafe for other officers to approach within contact range
> of the subject.

(Docket Entry No. 34, Ex. G at 1).  The Procedure requires specialized taser training, testing, and certification, as well as training in the general use-of-force policies.  (*Id*.; Docket Entry No. 34, Ex. P at 2-3).  The training requires that each officer experience the use of a taser personally.  Tasers must be tested before removal from secured storage.  (Docket Entry No. 34, Ex. G. at 1-2).  An officer must warn in advance that he intends to use a taser and another officer must be present; ideally two other officers should be present.  (*Id.*).  EMS must be called after a taser is used.  (*Id.*).  Spent cartridges from distance taserings must be filed as evidence.  (*Id.* at 3).  Officers who taser a subject must document the taser use in the incident report and in a separate written use-of-force report.  (*Id.* at 2).  The record shows that as a matter of law, the written policy and training program for the use of tasers is neither vague nor inadequate.

Constant's expert witness testified that an unwritten policy or custom may have caused the improper use of the taser that Constant alleges.  The expert witness extrapolated this policy or custom from Sergeant Holden's deposition testimony stating that he thought it could be appropriate to use a taser on a suspect who must be subdued until that suspect is compliant. (Docket Entry No. 35, Ex. F at 30).  The expert witness testified that Holden's description would permit indefinite tasering, which is "akin to torture." (*Id.*)  The deposition testimony cited does not support an inference that the Police Department had a policy or custom of indefinite tasering until a suspect is wholly compliant, or that such an approach

was used on Constant.  Holden testified that although Constant's continued resistance and struggles required led  him to use repeated taser applications, he did not wait until the tasering stopped Constant's struggles.  Instead, he stopped using the taser and used physical force to restrain Constant.  (Docket Entry No. 35, Ex. D at 54, 92).

Constant also claims a policy or custom of inadequate training and supervision in taser use as a basis to impose liability on the City of Baytown and the supervisory officers. Constant has failed to raise a fact issue as to whether there was a policy or custom of providing inadequate training or supervision in taser use, evidencing deliberate indifference to the rights of those likely to come into contact with police officers, which caused the constitutional deprivation plaintiff alleges.  *Roberts*, 397 F.3d at 292.

 The record indicates that all the officers who responded to Constant's January 2002 call to the police and subsequent police calls for assistance were trained in taser use and in the use of force.  Officers Felder and Fischer had 16 hours of such training, Sergeant Holden and Officer Wilburn 60 hours. (Docket Entry No. 34, Ex. R at 3, Ex. S at 3, Ex. T at 4, Ex. U at 4).  Officers Felder, Fischer, and Wilburn, and Sergeant Holden have 1,619, 1,399, 1,818, and 2,656 hours of total training, respectively, for a combined total of over 7,000 hours of professional training.  *Id*.  The Baytown Police Department requires additional taser training.  Both of the officers who used a taser so that Constant could be placed in the ambulance and taken to the hospital were trained and certified in taser operation.  (Docket Entry No. 34, Ex. C at 38, Ex. D at 25-26; Docket Entry No. 35, Ex. J at 6).  Constant has not identified nor submitted summary judgment evidence that raises a fact question as to the

adequacy of the officers' training in the use of tasers.  *See generally, Caldwell v. Moore*, 968 F.2d 595, 597 (6th Cir. 1992) (affirming summary judgment dismissing a claim that training for correctional officers in the use of tasers violated the Eighth Amendment).

Nor has Constant raised a fact issue as to whether inadequate training caused the constitutional injury she alleges.  "[It will not] suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. . . . And, plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable."  *Pineda,* 291 F.3d at 333, *citing City of Canton*, 489 U.S. at 391.  Constant  has not alleged specific facts or presented summary judgment evidence linking the alleged lack of training as the cause of her injury.  Nor has she identified specific additional training or supervision the officers should have received that would have prevented this incident.  *See Pineda*, 291 F.3d at 325.

Finally, Constant has failed to raise a fact issue as to whether there was deliberate indifference on the part of the City policymakers.  There is no evidence of knowledge of a pattern of similar incidents or "notice of a pattern of similar violations."  *Estate of Davis v. N. Richland Hills*, 406 F.3d 375, 383-84 (5th Cir. 2005) (failing to show past use of excessive force, complaints against the officer, or knowledge of supervisors).  Even substantial infractions are insufficient to show deliberate indifference if there is no pattern related to the constitutional violation.  *See, e.g., McGowen*, 207 F.3d 226 (finding no deliberate indifference to the danger of excessive force when the officer had exhibited a clear

21

pattern of prior use of violence and force).  The record in this case presents no evidence of a pattern of prior use of violence or excessive force by the Baytown police officers involved in the January 2002 encounter with Constant.  Instead, the record reflects that three of the four officers involved in the January tasering incident have minor infractions unrelated to the use of force.  One officer, Fischer, was disciplined in 2001 or 2002 with a one-day suspension without pay for improper use of a baton.  (Docket Entry No. 34 at 19-23).  There was no subsequent occurrence of excessive force in his record; the rest of the officers have never been disciplined for excessive force.  The summary judgment evidence does not raise a fact issue as to whether the police officers' conduct was "obviously likely to result in a constitutional violation."  *Roberts*, 397 F.3d at 294-95.

### B.      The Claims against the Individual Defendants

The evidence in the record that leads this court to grant summary judgment as to municipal liability also defeat the claims against the individual defendants, based on qualified immunity.  The summary judgment record shows no basis to conclude that the individual defendants were deliberately indifferent to a risk of excessive tasering or excessive force in the Baytown Police Department.  The record does not show that the individual defendants knew of prior incidents of improper taser use.  *See Pineda*, 291 F.3d at 330 (summary judgment as to excessive force claim upheld despite evidence of eleven similar previous incidents, because policymakers had no knowledge).  The record shows no evidence of a pattern of similar incidents or that the policymakers knew of such a pattern.  The individual defendants deny any such knowledge and the record contains no contravening evidence.

22

(Docket Entry Nos. 34, Ex. E, Affidavit of Pete Alfaro; Ex. I, Affidavit of Coleman Godwin;

Ex. G, Affidavit of Ronnie Anderson;  Ex. J, Affidavit of Gary Jackson; Ex. M, Affidavit of

Donald Murray; Ex. N, Affidavit of Mercedes Renteria III; Ex. O, Affidavit of Scott Sheley).

The Baytown record custodian could find no complaints brought to the City Council about

tasers.  (*Id.* at Ex. H).

     The individual defendants' summary judgment motion is granted.


**IV.    Conclusion**

     The defendants' summary judgment motion is granted. Final judgment is entered by

separate order**.**

     SIGNED on September 27, 2006, at Houston, Texas.

                        _____

                                Lee H. Rosenthal
                        United States District Judge